1

2

Honorable

Dawn McCraw WA #54543
**CONSUMER ATTORNEYS**
450 Alaskan Way South, Suite 200
Seattle, Washington 98104
T: 602.807.1527
F: (718) 715-1750
E: dmmcraw@consumerattorneys.com
*Attorneys for Plaintiff*
*Veronica Durphey*

3

4

5

6

7

8

9

10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## SEATTLE DIVISION

11

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| VERONICA DURPHEY, | Case No.: 2:24-cv-00468 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC.; EQUIFAX INFORMATION SERVICES, LLC; and LEXISNEXIS RISK SOLUTIONS, INC. | |
| Defendants. | |

21

22

23

24

25

26

27

Veronica Durphey ("Plaintiff" or "Ms. Durphey") a living, breathing 60-year-old consumer, brings this action on an individual basis, against Defendants Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); Trans Union, LLC ("Trans Union"); and LexisNexis Risk Solutions, Inc. ("LexisNexis") (collectively, the "Credit Bureau Defendants" or "Defendants") and states as follows:

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.    whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein Defendants Equifax, Experian, Trans Union, and LexisNexis reported to Plaintiff's potential creditors that she is "deceased" and does not have a credit score.

12.    Accordingly, Plaintiff brings claims against Defendants Equifax, Experian, and Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs consumer reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13.    Plaintiff brings claims against Defendants Equifax, Experian, and Trans Union for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., as described herein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## PARTIES

15.    Veronica Durphey ("Plaintiff" or "Ms. Durphey") is a natural person residing in Issaquah, Washington and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the State of Florida, including within this District. Experian can be served through its registered agent, CT Corporation System at, 330 N Brand Blvd., Glendale, CA 91203.

17.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

18.    Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served through its registered agent Corporation Service Company at, 2 Sun Court Suite 400, Peachtree Corners, GA 30092.

19.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the State of Florida, including

within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company at, 801 Adlai Stevenson Drive, Springfield, IL 62703.

21.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.     Defendant LexisNexis Risk Solutions, Inc. ("Defendant" or "LexisNexis") is a Delaware corporation doing business throughout the United States, including the State of Minnesota and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, The Corporation Company, located at 40600 Ann Arbor Rd E, Suite 201, Plymouth, Michigan 48170.

23.     LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

26.     The FCRA governs the conduct of consumer reporting agencies in an effort

to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See 15 U.S.C. § 1681(a).

28.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  See 15 U.S.C. § 1681(b).

29.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

30.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The Credit Bureau Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

31.    The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

32.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

33.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

34.    The Credit Bureau Defendants routinely place a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

35.    Defendants Equifax's, Experian's, and Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro 2.

36.    The Credit Bureau Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

37.    The Credit Bureau Defendants do not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

38.    The Credit Bureau Defendants do not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

39.    In some cases, in order to assure accuracy, the Credit Bureau Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed

in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado.

40.     Defendant LexisNexis does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when LexisNexis has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

41.     Defendants Equifax, Experian, and Trans Union do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

42.     The Social Security Administration (SSA) maintains the Death Master File ("DMF").  The DMF is also known commercially as the Social Security Death Index (SSDI).  The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA.  The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA.  The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

43.     Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

44.     Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the Limited Access Death Master File (LADMF) electronically on a weekly and monthly basis.

45.     The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and

other federal agencies.  The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.  The SSA does not guarantee 100% of the data.

46.    The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1]

47.    The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[2]

48.    The Credit Bureau Defendants do not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

49.    Despite being subscribers of the NTIS LADMF, Defendants Equifax, Experian, and Trans Union do not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF before selling a credit report about said consumer, or at any time.

50.    Defendants Equifax, Experian, and Trans Union will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

51.    Despite being a subscriber to the NTIS LADMF, Defendant LexisNexis does not cross-reference the information it has received suggesting a consumer is deceased

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast);* Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio.*

[2] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov.* 2016-03-24. Archived from the original on 2020-07-16.

with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a credit report about said consumer, or at any time.

52.     The Credit Bureau Defendants fail to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

53.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Credit Bureau Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

54.     Even in instances where the purportedly deceased consumer communicates directly with the Credit Bureau Defendants, the Credit Bureau Defendants do not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

55.     Once a "deceased" mark is placed upon a consumer's report, Defendants Equifax, Experian, and Trans Union will not calculate and will not provide a credit score for that consumer.

56.     Upon Defendants Equifax's, Experian's, and Trans Union's reports with a "deceased" mark sold to third parties, Defendants Equifax, Experian, and Trans Union never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A" or "0."

57.     Defendants Equifax, Experian, and Trans Union know that third party credit issuers require a credit score in order to process a given credit application.

58.     Defendants Equifax, Experian, and Trans Union know that consumers without credit scores are unable to secure any credit from most, if not all, credit issuers.

59.     Defendants Equifax, Experian, and Trans Union know that living consumers

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

60.     Defendants Equifax, Experian, and Trans Union have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Credit Bureau Defendants are inaccurately reporting them as "deceased" and without a credit score.

61.     Defendant LexisNexis knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased."

62.     Defendant LexisNexis has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased."

63.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants had erroneously marked them as "deceased" on their consumer reports.

64.     Defendants Equifax, Experian, and Trans Union know that thousands of consumers are erroneously marked as "deceased" on their consumer reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

65.     Defendant LexisNexis knows that thousands of consumers are erroneously marked as "deceased" on their consumer reports.

66.     Nevertheless, the Credit Bureau Defendants do not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and consumer reports.

67.     Even consumers who dispute the erroneous "deceased" status on Equifax, Experian, and Trans Union credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

68.    Defendants Equifax, Experian, and Trans Union do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

69.    Nor do the Credit Bureau Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

70.    For years after a consumer's actual death, the Credit Bureau Defendants will continue to sell credit reports about that consumer.

71.    The Credit Bureau Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

72.    The Credit Bureau Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

73.    The Credit Bureau Defendants profit from the sale of reports on deceased consumers.

74.    Defendants Equifax, Experian, and Trans Union have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

75.    The Credit Bureau Defendants know that truly deceased consumers do not apply for credit.

76.    The Credit Bureau Defendants know that truly deceased consumers do not make positive monthly payments on open accounts being reported by the Credit Bureau Defendants.

77.    The Credit Bureau Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to the Credit Bureau Defendants to be a common and major source of identity theft.

78.    The Credit Bureau Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

79.    Defendants Equifax, Experian, and Trans Union warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

80.    Defendants Equifax, Experian, and Trans Union have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

81.    Defendant LexisNexis knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

82.    Defendant LexisNexis knows that identity theft and credit fraud are serious and widespread problems in our society.

83.    The Credit Bureau Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

84.    For consumers who are deceased, there rarely, if ever, exists a permissible

purpose under the FCRA for the Credit Bureau Defendants to sell their credit reports, absent a court order.

85.     The Credit Bureau Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

### Plaintiff Notices Unusual Activity with Her Credit Score

86.     Between February and March 2023, Plaintiff noticed through her credit monitoring service, Credit Wise, that her credit scores would periodically drop to "0."

87.     Credit Wise, a credit monitoring service offered by non-party Capital One Bank, N.A. for its customers, obtains consumer information from Defendant Trans Union.

88.     Sometime thereafter, and on multiple occasions, Plaintiff called Defendant Trans Union to inquire about this drop in her credit score to "0."

89.     The representative of Trans Union informed Plaintiff that this was a "glitch."

### Plaintiff Applied for Auto Insurance in August 2023

90.     In or around August 2023, Plaintiff discovered her auto insurance company, non-party Allstate Insurance, unexpectedly and promptly cancelled Plaintiff's auto insurance policy due to a billing error caused by Allstate.

91.     Plaintiff's job as an insurance broker licensed by the state of Washington has a mandatory requirement that she maintains auto insurance.

92.     In immediate need of auto insurance, Plaintiff began looking for another company for auto insurance.

93.     In or around August 2023, Plaintiff called many insurance companies, including The Harford's, Travelers, and Geico.

94.     One of the insurance companies Plaintiff contacted was Farmers Insurance,

specifically her prior insurance broker, Jeffrey McGowan.

95.    Plaintiff completed and submitted an application with McGowan to obtain auto insurance. Plaintiff provided her personal identification information, including her social security number, to McGowan and gave consent to obtain Plaintiff's consumer reports and/or credit scores in order to determine Plaintiff's eligibility for insurance purposes.

### Plaintiff is Denied Auto Insurance in August 2023

96.    On August 8, 2023, Plaintiff's insurance broker ordered a consumer report about Plaintiff from Defendant LexisNexis.

97.    Defendant LexisNexis published information about Plaintiff in response to that auto insurance application on or about August 8, 2023.

98.    Upon receipt and review of Defendant LexisNexis's report about Plaintiff, Plaintiff's insurance broker informed Plaintiff that he was unable to approve Plaintiff's application for insurance. Specifically, Plaintiff's application for auto insurance was denied because Defendant LexisNexis was reporting Plaintiff as deceased.

99.    On or about August 8, 2023, Plaintiff's application for auto insurance was denied based upon the contents of Defendant LexisNexis' consumer report sold about Plaintiff.

100.    Upon review of the denial, the reason Plaintiff's application for insurance was denied was because Defendant LexisNexis was reporting Plaintiff as deceased.

101.    McGowan emailed Plaintiff a screenshot of State Farm's internal system that said, "Credit Error - The credit vendor is reporting that the PNI is deceased."

102.    Due to the deceased reason for denial, McGowan recommended that Plaintiff contact the credit bureaus.

103.    Plaintiff was extremely upset to learn that Defendant LexisNexis had reported that Plaintiff was deceased.  Certainly, Plaintiff was not deceased. Plaintiff was

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

very distressed at the continued furthering of information suggesting she was deceased. Plaintiff was frustrated at the credit denial because she very much needed auto insurance. Plaintiff felt that the recipients of that information no doubt questioned her motives and integrity and worst yet possibly suspected her of identity theft as they could clearly discern that she was not deceased.

104.    Plaintiff has leukemia and finding out that she is being reported as deceased is all the more distressing to her and has created great anxiety.

105.    In or around August 8, 2023, Defendant Trans Union published information that Plaintiff was deceased to Hartford Insurance Co. in response to Plaintiff's auto insurance application.

106.    Specifically, Trans Union reported "CONSUMER IS DECEASED. DATE OF DEATH IS 05/01/2023. DATED 05/29/2023."

107.    Upon info and belief, in or around August 9, 2023, Defendant Experian published information that Plaintiff was deceased to Commerce West Washington in response to Plaintiff's auto insurance application.

108.    Specifically, Experian reported "DOCUMENTATION HAS BEEN PROVIDED CERTIFYING THAT THIS CONSUMER IS DECEASED 05-01-2023."

109.    Plaintiff tried to obtain auto insurance from many other companies but was verbally told that they could not obtain Plaintiff's consumer reports.

110.    Plaintiff recalls she was denied coverage approximately eight (8) times. She did not understand the reason since she has an almost flawless driving record.

111.    Upon info and belief, the deceased information was published to one or more unidentified auto insurance providers.

112.    After being denied on multiple occasions for auto insurance, Plaintiff was desperate to secure auto insurance from almost any auto insurance company that would approve her application.

113.    Plaintiff was eventually able to obtain auto insurance from Commerce West/ Maphree, but at a significantly higher rate and less favorable terms than she should have qualified for with her good driving record. It was the only company that would insure her; it had to be manually underwritten and she had to reactivate her AAA membership.

114.    On or about March 27, 2024, Plaintiff called Commerce West/ Maphree to inquire why her rate was so high and Commerce West/ Maphree confirmed that they could see the deceased reporting. They told Plaintiff they are still looking into why the rates are high.

**Plaintiff's Disputes Defendant Trans Union's Inaccurate Credit Reporting in August 2023**

115.    In or about August 8, 2023, (the "August 2023 dispute") extremely shocked, surprised, and embarrassed that Plaintiff was being reported as deceased, Plaintiff called Defendant Trans Union and disputed the deceased notation that it was reporting in her consumer reports.

116.    Plaintiff called Defendant Trans Union to inquire whether there was a deceased notation on Plaintiff's consumer file, and the representative of Trans Union confirmed that Trans Union was reporting Plaintiff as deceased.

117.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

118.    Plaintiff disputed the deceased notation that Trans Union was reporting on her consumer report.

119.    Plaintiff explained that any notation that she was deceased on her credit files was inaccurate as she was alive, evidenced by her phone call, among other things.

120.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and, upon information and belief, to send her a corrected copy of her

consumer report.

121.    Plaintiff recalls the Trans Union agent saying again that Plaintiff's score of "0" must be a glitch.

122.    Upon information and belief, Plaintiff never heard back from Trans Union regarding her dispute of the inaccurate deceased notation.

123.    Upon information and belief, Trans Union failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

124.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's August 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Disputes Defendants Equifax's, Experian's, and Trans Union's Inaccurate Credit Reporting in September 2023**

125.    In or about September 8, 2023, (the "September 2023 dispute") extremely concerned about being reported as deceased, Plaintiff called Defendants Equifax, Experian and Trans Union and disputed the deceased notation that each were reporting in her consumer reports.

126.    Plaintiff called Defendant Equifax first to inquire whether there was a deceased notation on Plaintiff's consumer file, and the representative of Equifax confirmed that Equifax was reporting Plaintiff as deceased. Upon information and belief, the representative of Equifax also told Plaintiff that all the CRAs share information about consumers with each other.

127.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

128.    Plaintiff disputed the deceased notation that Equifax was reporting on her

1    consumer report.

2    129.    During this 24-minute-long call, Plaintiff explained that any notation that

3    she was deceased on her credit files was inaccurate as she was alive, evidenced by her

4    phone call, among other things.

5    130.    Plaintiff requested that Equifax reinvestigate the disputed information,

6    correct the reporting and send her a corrected copy of her consumer report. Plaintiff also

7    requested her Equifax score.

8    131.    The Equifax agent told Plaintiff that she needed to prove she was alive.

9    Plaintiff responded that Equifax needed to send her proof she was dead.

10    132.    After her dispute to Equifax, Plaintiff then called Defendants Experian and

11    Trans Union and disputed the deceased notation that each were reporting in her consumer

12    reports.

13    133.    Plaintiff recalls getting into an argument with the Trans Union agent, a

14    woman, who told Plaintiff that her dispute did not matter because Plaintiff was dead

15    anyway and then the agent hung up on Plaintiff.

16    134.    Plaintiff recalls the agent from Experian being uncooperative and Plaintiff

17    just kept getting transferred.

18    135.    The Experian agent told Plaintiff that she had to go online to Experian.com

19    to formally dispute the inaccuracy.

20    136.    Plaintiff called Defendants Experian and Trans Union to inquire whether

21    there was a deceased notation on Plaintiff's consumer files, and the representatives of

22    Experian and Trans Union both confirmed that Experian and Trans Union were also

23    reporting Plaintiff as deceased.

24    137.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or

25    to follow reasonable procedures to assure maximum possible accuracy of the credit

26    information it published and maintained concerning Plaintiff.

27

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

138.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

139.    Plaintiff disputed the deceased notations that Experian and Trans Union were reporting on her consumer reports.

140.    Plaintiff explained that any notation that she was deceased on her credit files was inaccurate as she was alive, evidenced by her phone call, among other things.

141.    Plaintiff requested that Experian and Trans Union reinvestigate the disputed information, correct the reporting, and, upon information and belief, to send her a corrected copy of her consumer report.

142.    Defendant Equifax has never provided Plaintiff her score (Equifax told her on the phone that it must have gotten lost in the mail), and she has been locked out of her myEquifax account since January 11, 2024 and has no idea why.

143.    Upon information and belief, Plaintiff never heard back from Defendants Equifax, Experian, or Trans Union regarding her disputes of the inaccurate deceased notation.

144.    Upon information and belief, Equifax, Experian, and Trans Union failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

145.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's August 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

146.    Experian failed to conduct a reasonable reinvestigation of Plaintiff's August 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A)

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

147.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's August 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A)

**Plaintiff's Disputes Defendant Trans Union's Inaccurate Credit Reporting in November 2023**

148.    In or about November 1, 2023, (the "November 2023 dispute") Plaintiff called Defendant Trans Union and disputed the deceased notation that it was reporting in her consumer reports.

149.    Plaintiff called Defendant Trans Union to inquire whether there was a deceased notation on Plaintiff's consumer file, and the representative of Trans Union confirmed that Trans Union was reporting Plaintiff as deceased.

150.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

151.    Plaintiff disputed the deceased notation that Trans Union was reporting on her consumer report.

152.    During this 16-minute-long call, Plaintiff explained that any notation that she was deceased on her credit files was inaccurate as she was alive, evidenced by her phone call, among other things.

153.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and, upon information and belief, to send her a corrected copy of her consumer report.

154.    Upon information and belief, Plaintiff never heard back from Trans Union regarding her dispute of the inaccurate deceased notation.

155.    Upon information and belief, Trans Union failed to correct or delete the

deceased notation appearing in Plaintiff's credit file.

156.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's November 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Disputes Defendant Trans Union's Inaccurate Credit Reporting in December 2023**

157.    In or around December 26, 2023, Plaintiff obtained a copy of her consumer file from Trans Union.

158.    Upon review, Plaintiff saw that there was a deceased notation on her Trans Union consumer file. Specifically, Trans Union reported "Deceased Date: 5/01/2023" and a Consumer Statement that reads "Consumer is deceased. Date of death is 5/1/2023. Dated 5/29/2023."

159.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

160.    In or about December 26, 2023, (the "December 2023 dispute") Plaintiff again called Defendant Trans Union and disputed the deceased notation that it was reporting in her consumer reports.

161.    Plaintiff again called Defendant Trans Union to inquire whether there was a deceased notation on Plaintiff's consumer file, and the representative of Trans Union confirmed that Trans Union was reporting Plaintiff as deceased.

162.    During this 42-minute-long call, Plaintiff disputed the deceased notation that Trans Union was reporting on her consumer report.

163.    Plaintiff explained that any notation that she was deceased on her credit files was inaccurate as she was alive, evidenced by her phone call, among other things.

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

164.    Upon information and belief, the representative of Trans Union requested that Plaintiff submit identifying documents showing evidence of "proof of life."

165.    Despite Plaintiff's previous multiple disputes to Trans Union that Plaintiff was not deceased, Trans Union did not believe Plaintiff.

166.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and, upon information and belief, to send her a corrected copy of her consumer report.

167.    Upon information and belief, Plaintiff never heard back from Trans Union regarding her dispute of the inaccurate deceased notation.

168.    Upon information and belief, Trans Union failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

169.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's November 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Plaintiff's Disputes Defendant Experian's Inaccurate Credit Reporting in December 2023

170.    In or about December 28, 2023, (the "December 2023 dispute") Plaintiff called Defendant Experian and disputed the deceased notation that it was reporting in her consumer reports.

171.    Plaintiff called Defendant Experian to inquire whether there was a deceased notation on Plaintiff's consumer file, and the representative of Experian confirmed that Experian was reporting Plaintiff as deceased.

172.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

173.    Plaintiff disputed the deceased notation that Experian was reporting on her consumer report.

174.    During this 26-minute-long call, Plaintiff explained that any notation that she was deceased on her credit files was inaccurate as she was alive, evidenced by her phone call, among other things.

175.    Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and, upon information and belief, to send her a corrected copy of her consumer report.

176.    In or around January 4, 2024, Plaintiff viewed a copy of her Experian consumer file.

177.    Upon review, Plaintiff saw that Plaintiff did not have a FICO score and there was a deceased notation on her Experian, consumer file. Specifically, within Plaintiff's Experian consumer report, there is a personal statement that states, "documentation has been provided certifying that this consumer is deceased on 5-1/23."

178.    Experian failed to correct or delete the deceased notation appearing in Plaintiff's credit file.

179.    Experian failed to conduct a reasonable reinvestigation of Plaintiff's December 2023 dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Files CFPB Complaints Against Experian, Equifax, and Trans Union in December 2023**

180.    On or about December 26, 2023, Plaintiff filed a complaint with the Consumer Financial Protection Bureau ("CFPB") against Trans Union explaining that Trans Union was inaccurately reporting her as deceased and would not correct it. She asked for Trans Union to provide her proof that she was "deceased."

181.    Trans Union responded to Plaintiff's complaint on or about February 1, 2024 indicating that it understood Plaintiff's CFPB complaint to be a dispute and that a Trans Union report had been mailed to her home. Upon information and belief, Plaintiff never received that report.

182.    On or about December 27, 2023, Plaintiff filed a complaint with the CFPB against Equifax explaining that Equifax was inaccurately reporting her as deceased and would not correct it.

183.    Equifax responded to Plaintiff's complaint on or about January 25, 2024 stating there was no deceased notation on her report.

184.    On or about December 27, 2023, Plaintiff filed a complaint with the CFPB against Experian explaining that Experian was inaccurately reporting her as deceased and would not correct it.

185.    Equifax responded to Plaintiff's complaint on or about February 23, 2024 mentioning nothing at all about the deceased notation and simply stating the "disputed information" was not reporting.

**Defendants Equifax's, Experian's and Trans Union's Method for Considering Consumer Credit Report Disputes**

186.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

187.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

188.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

189.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

190.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

191.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

192.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

193.    . These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

194.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

195.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

196.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via

1  e-OSCAR.

2  197.  Plaintiff reasonably believes that the Credit Bureau Defendants continued

3  to publish that she was deceased in the credit reports they each issued about her.

4  198.  As a result of the "deceased" notation, the Defendants made it practically

5  impossible for Plaintiff to continue to obtain credit.

6  199.  At all times pertinent hereto, Defendants were acting by and through their

7  agents, servants, and/or employees who were acting within the course and scope of their

8  agency or employment, and under the direct supervision and control of the Defendants

9  herein.

10  200.  At all times pertinent hereto, the conduct of Defendants, as well as that of

11  their respective agents, servants, and/or employees, was intentional, willful, reckless,

12  grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

13  201.  As a standard practice, the Credit Bureau Defendants do not conduct

14  independent investigations in response to consumer disputes. Instead, they merely parrot

15  the response of the credit furnisher despite numerous court decisions admonishing this

16  practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The

17  'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than

18  merely parroting information received from other sources. Therefore, a 'reinvestigation'

19  that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the

20  obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp.

21  2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on

22  automated procedures that make only superficial inquiries once the consumer has notified

23  it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047,

24  at *6 (S.D.N.Y. Nov. 19, 2008).

25  202.  The Credit Bureau Defendants are aware of the shortcomings of their

26  procedures and intentionally choose not to comply with the FCRA to lower their costs.

27

Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

203.    After months of trying to get her credit corrected, Plaintiff has become nearly obsessed with who was reporting her as "dead." Plaintiff questioned her parents, her children, her employer, friends, the Fred Hutchinson Cancer Center, and others in a desperate attempt to learn who is trying to harm her and why. Plaintiff still has no idea of the source of the deceased mark.

204.    Plaintiff is driving a car that needs repair and she is not sure how much longer it will operate. She cannot use her credit to fix it because she is "deceased."

205.    Plaintiff cries all the time because she does not know how to get the deceased reporting removed.

206.    Plaintiff was so distressed she contacted and/or filed complaints with every agency she could think of, including the SSA, FTC, FBI, and IRS, and ordered death records from Georgia, Washington, Arizona, Utah, and Illinois to find out why she is being reported as deceased.

207.    Plaintiff also signed up for Lifelock monitoring in fear that the issue is related to identity theft.

208.    Plaintiff has had to explain to her doctor (Dr. Prakasam) over several months the impact on her of the deceased reporting by Defendants because it has caused health issues and aggravated Plaintiff's leukemia and blood pressure.

209.    Dr. Prakasam just recommended Plaintiff see a psychologist and prescribed an anti-depressant to Plaintiff about a month ago.

210.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by denials of credit; lost credit opportunities; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and

extreme emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and continuously being told she was dead. This entire mess of deceased reporting for so many months, which continues to this day, has caused Plaintiff tremendous pain.

211.    To Plaintiff, it is extremely distressing each time she is told that one or more of the Credit Bureau Defendants reports her as deceased when she is battling leukemia and trying to stay alive. Plaintiff does not need a constant reminder that she has a disease that could take her life at any moment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, Trans Union, and LexisNexis)**

212.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

213.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure *maximum possible accuracy* of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

214.    On at least one occasion in 2023, Defendants Equifax, Experian, Trans Union, and LexisNexis prepared patently false consumer reports concerning Plaintiff.

215.    Despite actual and implied knowledge that Plaintiff is not dead, Defendants Equifax, Experian, Trans Union, and LexisNexis readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's

COMPLAINT AND DEMAND FOR JURY TRIAL
CASE NO.: 2:24-cv-00468

Consumer Attorneys
450 Alaskan Way South, Suite 200
Seattle, Washington 98104

creditworthiness.

216.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

217.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

218.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

219.    Defendant LexisNexis violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

220.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

221.    Defendants Equifax's, Experian's, Trans Union's, and LexisNexis's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under

15 U.S.C. § 1681o.

222.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, Trans Union, and LexisNexis in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

223.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

224.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. Id.

225.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

226.    On at least one occasion during 2023, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, stating that she is "deceased."

227.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

228.    In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically

inconsistent, and damaging information to remain in Plaintiff's credit file.

229.   In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

230.   Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

231.   As a result of Defendants Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

232.   Defendants Equifax's, Experian's, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

233.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i.      Determining that Defendants negligently and/or willfully violated the FCRA;

ii.     Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: April 8, 2024,                          By: */s/ Dawn McCraw*
                                               Dawn McCraw WA #54543
                                               **CONSUMER ATTORNEYS**
                                               450 Alaskan Way South, Suite 200
                                               Seattle, Washington 98104
                                               T: 602.807.1527
                                               F: (718) 715-1750
                                               E: dmmcraw@consumerattorneys.com
                                               *Attorneys for Plaintiff*
                                               *Veronica Durphey*