UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VERONICA DURPHEY ,<br><br>    Plaintiff,<br><br>  v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC., et al.,<br><br>    Defendants. | CASE NO. C24-468 MJP<br><br>ORDER ON DEFENDANT<br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.'S MOTION TO<br>COMPEL ARBITRATION AND<br>MOTION TO STAY DISCOVERY |

This matter comes before the Court on Defendant Experian Information Solutions, Inc.'s

Motion to Compel Arbitration (Dkt. No. 50), and Motion to Stay Discovery (Dkt. No. 52).

Having reviewed the Motions, the Oppositions (Dkt. Nos. 54), the Replies (Dkt. Nos. 56, 57), the

Supplemental Briefs (Dkt. Nos. 64, 67), the Notices of Supplemental Authority (Dkt. Nos. 71

72), and all supporting materials, the Court GRANTS Experian's Motion to Compel Arbitration

and DENIES AS MOOT Experian's Motion to Stay Discovery.

**BACKGROUND**

Plaintiff Veronica Durphey has brought claims under the Fair Credit Reporting Act (FCRA) against four different consumer reporting agencies (CRAs) for inaccurately reporting that she was deceased and did not have a credit score. Although she settled with two CRAs—Equifax Information Services LLC and LexisNexis Risk Solutions, Inc.—she still pursues claims against Experian Information Solutions, Inc., and TransUnion LLC.

Between February and March 2023, Durphey discovered through a credit monitoring service that her credit score would periodically drop to "0". (Complaint ¶ 86 (Dkt. No. 1).) She reached out to TransUnion and was told that this was due to a "glitch." (Id. ¶¶ 88-89.) But in August 2023, she was denied auto insurance by Farmers Insurance because a consumer credit report it obtained from LexisNexis reported Durphey was deceased. (Id. ¶¶ 94-101.) Similarly, in response to Durphey's request for auto insurance, TransUnion published information to Hartford Insurance Co. that Durphey was deceased and Experian reported the same to Commerce West Washington. (Id. ¶¶ 105-08.) Durphey alleges that she disputed the credit information with all of these CRAs and that their response was not reasonable. (Id. ¶¶ 117-79.)

Durphey brings two claims under the FCRA: (1) Defendants failed to follow reasonable procedures to report accurate information (Compl. ¶¶ 212-22); and (2) Defendants failed to perform a reasonable reinvestigation (Id. ¶¶ 223-33.)

Defendant Experian now moves to compel arbitration of all Durphey's claims against it. (Dkt. No. 50.) It argues that Durphey agreed to arbitrate her claims when she signed up to receive credit monitoring services from an affiliate entity, Experian Consumer Services (ECS). Because the Motion to Compel Arbitration turns on this alleged agreement, the Court examines it in some detail.

Durphey enrolled in credit monitoring services from non-party Experian Consumer Services in 2016. (Declaration of Veronica Durphey ¶ 2 (Dkt. No. 55-2).) She claims that she was not aware she agreed to an arbitration provision and that if she knew she would waive her right to a jury trial, she would not have signed up for the services. (Id. ¶¶ 3-7.) Experian's corporate witness, Dan Smith, explains that Durphey enrolled in Experian Credit Services' "CreditWorks" service on December 23, 2016 and continued to be enrolled until January 18, 2024. (Declaration of Dan Smith ¶¶ 3, 5 (Dkt. No. 51).) Smith, who has been Experian since 2010, explains that he is familiar with the "consumer enrollment process into CreditWorks" and the steps a consumer would have had to take in 2016 to enroll. (Smith Decl. ¶ 1.) According to Smith, Durphey would have had to accept the Terms of Service in order to enroll. (Id. ¶ 3.) The website required Durphey to enter personal information on two successive web pages. (Id. ¶¶ 3-4.) After entering some personal information on the first webpage, the second required her to create an account and accept the Terms of Use Agreement. (Id. ¶ 4.) The following was disclosed to her:

> By clicking "Submit Secure Order": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy. I authorize ConsumerInfo.com, Inc., also referred to as Experian Consumer Services ("ECS"), to obtain my credit report and/or credit score(s), on a recurring basis to provide them to me for review while I have an account with ECS. I also authorize ECS to obtain and use the information I provide, and my credit report and/or credit score(s), on a recurring basis to notify me of credit opportunities and other products and services that may be available to me through ECS or through unaffiliated third parties. I understand that I may withdraw this authorization at any time by contacting ECS.

**Submit Secure Order**

1    (Smith Decl. Ex. 2.) In order to complete enrollment, Durphey had to press the "Submit Secure

2    Order" button. (Id.)

3          The Terms of Use Agreement in effect in 2016 stated "ECS and you agree to arbitrate all

4    disputes and claims between us arising out of this Agreement directly related to the Services or

5    Website[.]" (Smith Decl. Ex. 3 at 1 (Dkt. No. 51-1 at 6).) But the Agreement expressly carved

6    out FCRA claims: "for avoidance of doubt, any dispute you may have with us arising out of the

7    Fair Credit Reporting Act (FCRA) relating to the information contained in your consumer

8    disclosure or report, including but not limited to claims for alleged inaccuracies, shall not be

9    governed by this agreement to arbitrate." (Id.)

10          While this might upend Experian's arbitration request, it argues that Durphey agreed to

11   an updated Terms of Use Agreement issued in 2019 that no longer carved out FCRA claims.

12   Smith points out that by 2019, the Agreement was updated to remove this language. (Smith Decl.

13   ¶¶ 7, 9 & Ex. 5.) The 2019 Terms of Use Agreement states: "ECS and you agree to arbitrate all

14   disputes and claims between us arising out of this Agreement directly related to the Services or

15   Websites to the maximum extent permitted by law[.]" (Ex. 5 at 4 (Dkt. No. 51-1 at 59).) This

16   includes "claims arising out of or relating to any aspect of the relationship between us arising out

17   of any Service or Website, whether based in contract, tort, statute . . .  or any other legal theory;

18   claims that arose before this or any prior Agreement . . . ." (Id.) And the Agreement explained

19   that "[f]or purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall

20   include our respective parent entities, subsidiaries, affiliates. . . ." (Id.) According to Experian

21   Durphey agreed to these new terms because the 2016 Agreement gave notice that her continued

22   use of Experian's services would bind her to any modification. Specifically, the 2016 Agreement

23   stated "[t]his Agreement may be updated from time to time" and "[e]ach time you order, access

24

1    or use any of the Services or Websites, you signify your acceptance and agreement, without

2    limitation or qualification, to be bound by the then current Agreement." (Smith Decl. Ex. 3; <u>see</u>

3    Smith Decl. ¶ 7.)

4              To help explore this question of whether Durphey agreed to the updated Terms of Use

5    Agreement, the Court requested additional briefing concerning how Durphey was given notice of

6    and allegedly agreed to the updated Terms of Use. In support of its supplemental brief, Experian

7    filed a new declaration from Smith, in which he claims that Durphey agreed to the changes in the

8    arbitration provision. Specifically, Smith states that Durphey received the following email:

9    \\

10    \\

11    \\

12    \\

13    \\

14    \\

15    \\

16    \\

17    \\

18    \\

19    \\

20    \\

21    \\

22    \\

23    \\

24



1    (Second Smith Decl. ¶ 5 & Ex. 7 (captured from original; omitting second page).) Smith states

2    that Experian's records show Durphey received this email on April 3, 2023, and that she "clicked

3    on a link" and continued to use Experian's services. (Second Smith Decl. ¶ 5.) But Smith does

4    not state that Durphey clicked on the hyperlink to the Terms of Use. And the email itself does

5    not show that it was delivered to an email associated with Durphey. Indeed, nothing in Smith's

6    second declaration explains why the email refers to "Frank," and not Veronica—Durphey's

7    name. Regardless, it appears uncontested that Durphey continued to use the service until January

8    2024. (Smith Decl. ¶ 5.)

9           Both the 2016 and 2019 versions of the Terms of Use Agreement include a delegation

10   provision, giving the arbitrator the authority to decide issues of arbitrability. (Smith Decl. Ex. 3

11   (Dkt. No. 51-1 at 6); Smith Decl. Ex. 5 at 5 (Dkt. No. 51-1 at 60).) It states: "All issues are for

12   the arbitrator to decide, including the scope and enforceability of this arbitration provision as

13   well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive

14   authority to resolve any such dispute relating to the scope and enforceability of this arbitration

15   provision or any other term of this Agreement including, but not limited to any claim that all or

16   any part of this arbitration provision or Agreement is void or voidable." (Id.)

17          Finally, Smith explains that Experian Credit Services or ECS is an affiliate Defendant

18   Experian Information Solutions, Inc., and they are both subsidiaries of Experian Holdings, Inc.

19   (Smith Decl. ¶ 2.)

20                                           **ANALYSIS**

21   **A.    Motion to Compel Arbitration Legal Standard**

22          Section 2 of the Federal Arbitration Act ("FAA") governs arbitration agreements in any

23   contract affecting interstate commerce. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119

24

1   (2001). The FAA "reflect[s] both a liberal policy favoring arbitration . . . and the fundamental

2   principle that arbitration is a matter of contract." <u>AT & T Mobility LLC v. Concepcion</u>, 563 U.S.

3   333, 339 (2011) (cleaned up). "In line with these principles, courts must place arbitration

4   agreements on an equal footing with other contracts . . . and must enforce them according to their

5   terms." <u>Id</u>. (cleaned up); <u>see also</u> <u>Rent-A-Ctr., W., Inc. v. Jackson</u>, 561 U.S. 63, 67 (2010).

6   Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable" unless

7   invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.

8   9 U.S.C. § 2; <u>Poublon v. C.H. Robinson Co.</u>, 846 F.3d 1251, 1259 (9th Cir. 2017).

9       The party seeking to compel arbitration "bears the burden of proving the existence of an

10   agreement to arbitrate by a preponderance of the evidence." <u>Norcia v. Samsung Telecomm. Am.</u>,

11   845 F.3d 1279, 1283 (9th Cir. 2017). The Court must give the party denying the existence of an

12   agreement to arbitrate the benefit of all reasonable doubts and inferences, <u>see</u> <u>Alarcon v. Vital</u>

13   <u>Recovery Servs., Inc.</u>, 706 F. App'x 394, 394 (9th Cir. 2017) (citing <u>Three Valleys Mun. Water</u>

14   <u>Dist. v. E.F. Hutton & Co.</u>, 925 F.2d 1136, 1141 (9th Cir. 1991)), and applies ordinary state law

15   principles governing the formation of contracts. <u>First Options of Chicago, Inc. v. Kaplan</u>, 514

16   U.S. 938, 944 (1995); <u>Norcia</u>, 845 F.3d at 1283.

17       In deciding the motion to compel arbitration, the Court's role is "limited to determining

18   (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

19   encompasses the dispute at issue." <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126,

20   1130 (9th Cir. 2000). But "[w]hen the parties have clearly and unmistakably delegated questions

21   regarding arbitrability to the arbitrator, the court need not conduct further inquiries beyond the

22   existence of the arbitration agreement." <u>Fli-Lo Falcon, LLC v. Amazon.com, Inc.</u>, 97 F.4th 1190,

23   1194 (9th Cir. 2024).

24

**B.    Durphey Must Arbitrate Her Claim**

Experian has met its burden to show that Durphey agreed to arbitrate her claims.

As a threshold matter, the Court "must resolve any challenge that an agreement to arbitrate was never formed." Caremark, LLC v. Chickasaw Nation, 43 F.4th 1021, 1030 (9th Cir. 2022). Under Washington law, "[m]utual assent is required for the formation of a valid contract," including agreements to arbitrate. Burnett v. Pagliacci Pizza, Inc., 196 Wn.2d 38, 48 (2020). "In the context of online agreements, the existence of mutual assent turns on whether the consumer had reasonable notice of the terms of service agreement." Wilson v. Huuuge, Inc., 944 F.3d 1212, 1219 (9th Cir. 2019) (citing Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1177 (9th Cir. 2014) (applying Washington law). As is relevant here, "'[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." Oberstein v. Live Nation Ent., Inc., 60 F.4th 505, 515 (9th Cir. 2023) (quoting Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2022)). "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." Berman, 30 F.4th at 856.

Smith's declaration provides sufficient evidence that Durphey manifested her mutual assent to the 2016 Terms of Use Agreement when she enrolled in Experian's CreditWorks service in 2016. First, the website's form conspicuously disclosed that Durphey would be bound by the Terms of Use Agreement if she proceeded to enroll. The disclosure included a bolded hyperlink to the Agreement directly over the button. And Durphey reached the enrollment page

1  only after filling out an initial webform and entering sensitive personal information. This helps to

2  show that Durphey was not casually browsing the website—she was looking to obtain the

3  CreditWorks services. Second, Durphey had to take action to manifest her asset—she had to

4  click the "Submit Secure Order" button, which was just below the disclosure of the Terms of Use

5  Agreement and the hyperlink to it. These facts support a finding that Durphey assented to the

6  arbitration agreement. And Durphey does not contest that she was given fair notice or that the

7  clickwrap was inadequate. Rather, she says that she does not recall seeing the Terms of Use.

8  That is not a valid defense. On this basis the Court GRANTS the Motion to Compel Arbitration.

9      In so ruling, the Court rejects Durphey's argument that Experian cannot rely on Smith's

10 Declaration to compel arbitration. In essence, Durphey argues that Smith has insufficient

11 personal knowledge to show that Durphey agreed to be bound. But Smith has provided sufficient

12 personal knowledge that Durphey must have viewed the webpages he describes. Smith has

13 worked at Experian since 2010 and has personal knowledge of the enrollment process that

14 existed in 2016, when Durphey enrolled. (See Smith Decl. ¶ 1.) He states that he also reviewed

15 data to confirm Durphey enrolled in 2016, and he provides his personal knowledge as to what the

16 enrollment forms were at that time. (Id. ¶ 3.) While Durphey faults him for not providing the

17 underlying data, that does not make his declaration inadequate. Indeed, Durphey does not contest

18 that she enrolled, and the only missing documentation would be a tertiary support to what is an

19 uncontested point. More importantly, Smith provides sufficient personal knowledge to back up

20 his statement and the exhibits appended to his declaration that show Durphey must have clicked

21 the "Submit Secure Order" button to enroll in the CreditWatch service. The Court finds no flaw

22 in Smith's declaration, and notes the overwhelming majority of courts considering similar

23 declarations from Experian witnesses have been found admissible. See, e.g., Driskill v. Experian

24

1    Info. Sols., Inc., No. 24-CV-00583-AMO, 2024 WL 4453292, at *6 (N.D. Cal. Oct. 8, 2024);

2    (see also Reply at 2-3, 8-9 (collecting cases)).

3    **B.    Durphey Not Bound by Post-2016 Arbitration Provision**

4         Although Durphey agreed to the 2016 Terms of Use Agreement, the Court rejects

5    Experian's argument that she is bound by any of the later modifications to the Agreement.

6         "Under Washington law, contract formation requires an objective manifestation of

7    mutual assent." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 232 (2d Cir. 2016) (applying

8    Washington law). "Manifestation of assent to an online contract is not meaningfully different,

9    and can be accomplished by words or silence, action or inaction, so long as the user intends to

10   engage in the conduct and knows or has reason to know that the other party may infer from his

11   conduct that he assents." Id. (cleaned up). In other words, there must be reasonable notice, which

12   can be shown through actual knowledge or inquiry notice. See id. An enforceable agreement

13   based on inquiry notice "requires (1) reasonably conspicuous notice and (2) an unambiguous

14   manifestation of assent." Oberstein v. Live Nation Ent., Inc., 60 F.4th 505, 514 (9th Cir. 2023)

15   (considering California law); see Saeedy v. Microsoft Corp., No. C24-0219-SKV, 2024 WL

16   4945106, at *7 (W.D. Wash. Nov. 21, 2024) (noting that Washington and California law are

17   aligned on contract formation). "Unless the website operator can show that a consumer has

18   actual knowledge of the agreement, an enforceable contract will be found based on an inquiry

19   notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to

20   which the consumer will be bound; and (2) the consumer takes some action, such as clicking a

21   button or checking a box, that unambiguously manifests his or her assent to those terms."

22   Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 856 (9th Cir. 2022).

23

24

1       Experian has provided inadequate evidence to show that Durphey was given notice of the

2 change in arbitration provision after 2016 such that she might be bound by the modification to

3 the 2016 Terms of Use Agreement. According to Experian, it altered the Terms of Use in 2019 to

4 require all claims—even FCRA claims—to be arbitrated. (Smith Decl. ¶ 9.) Specifically,

5 Experian claims the initial carve out for FCRA claims "was amended out of the Terms of Use as

6 reflected in the January 2019 version of the Terms of Use[.]" (Id.) But Experian has provided no

7 evidence that it notified Durphey of this change in 2019 or how she would have had any

8 knowledge of the change. Without this evidence, the Court cannot find that Experian has met its

9 burden to show Durphey agreed to the modified Terms of Use. See Three Valleys Mun. Water

10 Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1141 (9th Cir. 1991) (noting that the defendant's

11 "burden is substantial and the Court must give the party denying the existence of an agreement

12 the benefit of all reasonable doubts and inferences that may arise" (cleaned up)).

13       Experian has also failed to demonstrate how its 2023 email provided Durphey actual or

14 inquiry notice of any change to the Terms of Use Agreement's arbitration provision. First, the

15 email to Durphey did not conspicuous disclose that there was a change in the Terms of Use

16 Agreement. Although Smith avers that the email was sent to Durphey, there is no email address

17 on the email and it appears addressed to "Frank" with a subject of "check out your latest

18 updates." (Second Smith Decl. Ex. 7.) The email's subject line does not indicate there are any

19 changes to the Terms of Use. More importantly, the notice about changes to the Terms of Use is

20 buried in the email, nestled in a visually small area between brighter colored and easier-to-read

21 information about different services that had nothing to do with the Terms of Use. This is not a

22 sufficient disclosure that would have put Durphey on notice. And unlike the disclosures Durphey

23 encountered when she signed up for the service, the email contained no means for Durphey to

24

1    affirmatively manifest her assent to the changes, such as clicking a box. Although Experian is

2    correct that continued use of a website can constitute assent, there must still be an adequate

3    disclosure of the changes themselves. See Saeedy, 2024 WL 4945106, at *15 (collecting cases).

4    Here, the notice was wholly inadequate to put Durphey on notice, and her continued use of the

5    website does not demonstrate assent to the new terms.

6        The Court finds that Experian has failed to meet its burden to prove that Durphey

7    assented to the modifications to the 2016 Terms of Use. The Court therefore holds that this

8    matter to be arbitrated only pursuant to the 2016 Terms of Use Agreement's arbitration

9    provision. Contrary to Experian's supplement brief, this determination falls to the Court, not the

10   arbitrator, because the question of whether Durphey assented to the modification is a legal

11   question about contract formation, not arbitrability. See Caremark, 43 F.4th at 103 (holding that

12   the Court "must resolve any challenge that an agreement to arbitrate was never formed").

13   Pursuant to the 2016 Terms of Use Agreement's delegation provision, the arbitrator must

14   determine whether the Durphey's FCRA claims fall within the Agreement's carve-out. See Fli-

15   Lo, 97 F.4th at 1194. The issue itself appears quite straightforward, and the Court sees no basis

16   on which the claims might have to be arbitrated. But, as inefficient as the process is, the Court is

17   bound to send the matter to arbitration for the arbitrator to make that call.

18   **C.    Experian May Enforce its Affiliate's Agreement**

19       In its request for supplemental briefing, the Court asked the Parties to address how

20   Experian could enforce the Terms of Use Agreement created by its affiliate. In response,

21   Durphey states that she does not wish to challenge Experian's ability to enforce the affiliate's

22   contract. This is not surprising, given the Ninth Circuit's decision in Meeks v. Experian Info.

23   Servs., Inc., No. 21-17023, 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022). Because Durphey

24

1    does not argue this is a reason to prevent arbitration, the Court declines to reach the issue and

2    accepts Experian's uncontested assertion that it may enforce the Terms of Use Agreement.

3    **D.      No Arbitration-Related Discovery**

4          The Court rejects Durphey's request to engage in arbitration-related discovery. The Court

5    finds no basis on which to allow discovery regarding contract formation. Durphey has not

6    explained what more information or testimony would be necessary to gather and the record

7    presented to the Court is sufficiently robust for it to make its determination on arbitration. The

8    Court does not believe that any further investigation into Durphey's consent to the 2016 Terms

9    of Use Agreement is necessary or appropriate. The Court REJECTS this request.

10   **E.      Stay of Case Pending Arbitration**

11         The Court GRANTS the Motion to Compel Arbitration pursuant to the 2016 Terms of

12   Use Agreement. Per Supreme Court authority, the Court STAYS Durphey's claims against

13   Experian until arbitration is completed, as Experian has requested. See Smith v. Spizzirri, 144

14   S.Ct. 1173, 1175 (2024). This will not prevent Durphey from litigating her claims against

15   TransUnion.

16   **F.      Motion to Stay Discovery**

17         In light of the Court's stay of Durphey's claims against Experian pending arbitration, the

18   Court DENIES AS MOOT Experian's Motion to Stay Discovery. Through this Motion, Experian

19   sought a stay of discovery only during the time it took the Court to decide the Motion to Compel

20   Arbitration. Having now rendered its decision, the Court finds that no further relief is necessary.

21   And given the stay of the underlying claims against Experian pending arbitration, discovery itself

22   shall also be stayed until the arbitration is complete.

23

24

ORDER ON DEFENDANT EXPERIAN INFORMATION SOLUTIONS, INC.'S MOTION TO COMPEL
ARBITRATION AND MOTION TO STAY DISCOVERY - 14

**CONCLUSION**

The Court finds that Durphey agreed to the 2016 Terms of Use Agreement and its arbitration provision. Because that agreement delegates the question of arbitrability, the Court must stay this action and allow the arbitrator to determine whether Durphey's claims fall within that provision. On this basis, the Court GRANTS the Motion to Compel Arbitration and STAYS this matter pending arbitration. The Court DENIES as MOOT Experian's Motion to Stay Discovery. The Parties are ORDERED to file a joint status report updating the Court on the outcome of arbitration within 14 days of the arbitrator's final decision.

The clerk is ordered to provide copies of this order to all counsel.

Dated January 24, 2025.

Marsha J. Pechman
United States Senior District Judge